## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COMSYS SOLUTIONS LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-745-RGA |
| | ) | |
| UNIPHORE TECHNOLOGIES INC. | ) | |
| | ) | |
| Defendant. | ) | |

### OPENING BRIEF IN SUPPORT OF THE RULE 12(C) MOTION
### FOR JUDGMENT ON THE PLEADINGS BY UNIPHORE TECHNOLOGIES INC.

Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
*Attorneys for Defendant Uniphore*
*Technologies Inc.*

OF COUNSEL:
Matthew S. Warren
Erika Warren
Francesca M.S. Germinario
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, CA 94114
(415) 895-2940

Dated: August 1, 2022

## <u>TABLE OF CONTENTS</u>

Nature and Stage of the Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.     The Asserted Patents Claim Only the Abstract Idea of Reading the Room . . . . . . 2

            1.     Different People May Like Different Things at Different Times . . . . . . . 3

            2.     The Patents Suggest Reading the Room to Give People What They Want . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.     The Patents Do Not Claim Any Specific Mechanism, But Instead Sweep in Any Attempt to Read the Room Using Any Technology . . . . . . . . . . . . . . . . . . . . . . . . 4

            1.     The Asserted Claims Are Representative . . . . . . . . . . . . . . . . . . . . . . . . . 4

            2.     Claim 5 of the '096 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            3.     Claim 11 of the '535 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.     *Alice* Step One:  The Claims Are Directed to the Patent-Ineligible Concept of Reading the Room . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.     Reading the Room, an Ancient Human Activity, is an Abstract Idea . . . . . . . . . . 9

      B.     Precedent Confirms the Asserted Patents Are Ineligible Under *Alice* . . . . . . . . 11

II.    *Alice* Step Two:  The Asserted Claims Contain No Inventive Step . . . . . . . . . . . . . . . . 13

      A.     '096 Patent Claim 5 Identifies Only Generic Components and No Inventive Step, Failing Step Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B.     '535 Patent Claim 11 Identifies Only Generic Components and No Inventive Step, Failing Step Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.   Comsys Cannot Plead Around The Requirements of Section 101 . . . . . . . . . . . . . . . . . 18

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**TABLE OF AUTHORITIES**

*Cases*                                                                 **Pages**

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
    838 F.3d 1266 (Fed. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 16

*Alice Corp. Pty. v. CLS Bank Int'l*,
    573 U.S. 208 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 13

*Appistry, Inc. v. Amazon.com, Inc.*,
    195 F. Supp. 3d 1176 (W.D. Wash., 2016) *aff'd sub nom. Appistry, LLC v. Amazon.com,
    Inc.*, 676 F. App'x 1008 (Fed. Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Bilski v. Kappos*,
    561 U.S. 593 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Broadsoft, Inc., v. CallWave Commc'ns, LLC*,
    282 F. Supp. 3d 771 (D. Del. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*BSG Tech. LLC v. Buyseasons, Inc.*,
    899 F. 3d 1281 (Fed. Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

*ClearDoc, Inc. v. RiversideFM, Inc.*,
    No. 21-1422, 2022 WL 606698 (D. Del. Feb. 22, 2022) . . . . . . . . . . . . . . . . . . 8, 12, 13

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
    859 F.3d 1352 (Fed. Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Collarity, Inc. v. Google Inc.*,
    No. 11-1103, 2015 WL 7597413 (D. Del. Nov. 25, 2015) . . . . . . . . . . . . . . . . . . . . 10

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F. 3d 1366 (Fed. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
    815 F. Appx 529 (Fed. Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ficep Corp. v. Peddinghaus Corp.*,
    No. 19-1994, 2022 WL 608189 (D. Del. Feb. 28, 2022) . . . . . . . . . . . . . . . . 9, 10, 11, 15

## TABLE OF AUTHORITIES

*Cases (continued)*                                                              **Pages**

*Intell. Ventures I LLC v. Capital One Bank,*
   792 F.3d 1363 (Fed. Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Internet Patents Corp. v. Active Network, Inc.,*
   790 F.3d 1343 (Fed. Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Inventor Holdings, LLC v. Gameloft, Inc.,*
   135 F. Supp. 3d 239 (D. Del. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*IPA Techs., Inc. v. Amazon.com, Inc.,*
   352 F. Supp. 3d 335 (D. Del. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Kaavo Inc. v. Cognizant Tech. Sols. Corp.,*
   No. 14-1192, 2016 WL 1268308 (D. Del. Mar. 31, 2016) . . . . . . . . . . . . . . . . . . . . . . . 8

*Mayo Collaborative Servs. v. Prometheus Lab'ys., Inc.,*
   566 U.S. 66 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Novo Transforma Techs., LLC v. Sprint Spectrum L.P.,*
   No. 14-612, 2015 WL 5156526 (D. Del. Sept. 2, 2015), *aff'd,* 669 F. App'x 555
   (Fed. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Realtime Data LLC v. Array Networks Inc.,*
   556 F. Supp. 3d 424 (D. Del. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*TrackTime, LLC v. Amazon.com, Inc.,*
   No. 18-1518, 2019 WL 2524779 (D. Del. June 19, 2019) . . . . . . . . . . . . . . . . . . . . 5, 19

*TriPlay, Inc. v. WhatsApp Inc.,*
   No. 13-1703, 2018 WL 1479027 (D. Del. Mar. 27, 2018) . . . . . . . . . . . . . . . . . . . . . . 19

*In re TLI Commc'ns LLC Patent Litig.,*
   823 F.3d 607 (Fed. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC,*
   874 F.3d 1329, 1341 (Fed. Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Turbe v. Gov't of the Virgin Islands,*
   938 F.2d 427 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.,*
   957 F. 3d 1303 (Fed. Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ultramercial, Inc. v. Hulu, LLC,*
   772 F.3d 709 (Fed. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## <u>TABLE OF AUTHORITIES</u>

*Cases (continued)* **Pages**

*X One, Inc. v. Uber Techs., Inc.*,
    239 F. Supp. 3d 1174 (N.D. Cal. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Zyrcuits IP LLC v. Acuity Brands, Inc.*,
    No. 20-1306, 2021 WL 3287801 (D. Del. Aug. 2, 2021) . . . . . . . . . . . . . . . . . . . . . . . 19

*Statutes and Rules* **Pages**

35 U.S.C. Section 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fed. R. Civ. P. 12(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## NATURE AND STAGE OF THE PROCEEDINGS

On June 6, 2022, Plaintiff Comsys Solutions LLC filed this action against Uniphore Technologies Inc., claiming infringement of U.S. Patent Nos. 9,324,096 and 9,672,535.  D.I. 1. The parties agreed to extend Uniphore's time to respond until August 1, 2022, and the Court entered their stipulation.  D.I. 8, 9.  Immediately before filing this motion, Uniphore filed its answer and affirmative defenses.  The parties have not filed any other motions in this matter.

## SUMMARY OF ARGUMENT

1.      The related '096 and '535 patents claim the abstract idea of reading the room, and are thus invalid under 35 U.S.C. § 101.  The patents broadly claim, using generic, well-known components, the concepts of gathering and storing information on all manner of human characteristics, from body language and facial expressions to age and personal preferences.  An "information content generator" (any broadcast system) then generates "information elements" (any form of communication) "based on" (in any way) those characteristics.  The patents do not provide any technical details on how to select or generate any actual communications, and thus claim nothing more than reading the room, an ancient human activity.

2.      The claims thus fail the two-step *Alice* test.  They provide no specific mechanism that improves any actual technology, but address only an abstract idea and invoke only generic processes and machinery to apply that idea.  The claims provide no inventive concept but instead rely on well-understood, routine, and conventional activities that the patent acknowledges were previously known.  The claims thus fail both prongs of the *Alice* test.

3.      Because the '096 and '535 patent claims are unpatentable as a matter of law, Comsys's factual allegations, taken as true, do not avoid dismissal.  To avoid waste of judicial and party resources, Uniphore respectfully requests that the Court enter judgment on the pleadings and dismiss the Complaint with prejudice.

## BACKGROUND

**A.     The Asserted Patents Claim Only the Abstract Idea of Reading the Room**

Comsys asserts two related patents, U.S. Patent Nos. 9,324,096 and 9,672,535, which share a common specification.  *See* Compl. ¶ 38; D.I. 1-1 ("'096 patent"), D.I. 1-2 ("'535 patent").  The patents generally concern "tailoring information that is or will be provided or delivered to information recipients based on one or more characteristics of the one or more information recipients," '096 patent at 1:20-24, who have varied interests based on "known, perceived, or predicted geographic, demographic, psychographic, and behavioristic characteristics."  *Id.* at 1:54-56.[1]  For example, "a 50-year old, professional, single male with a high annual income and a 30-year old married female with several children and with less financial means may have different interests in terms of vacation destinations."  *Id.* at 2:13-17.  Or "information recipients that have a strong desire for a different personal appearance may be more interested and responsive to information about clothing and clothing accessories than, say, an information recipient that is influenced by greed (although the two are not mutually exclusive)."  *Id.* at 2:28-33.

The specification describes "actively, dynamically, and seamlessly updating and tailoring information that is being or will be communicated to information recipients" based on "geographic, demographic, psychographic, and behavioristic characteristics, and inferred, derived, and direct physiological characteristics, which are continuously or nearly continuously being monitored and evaluated."  '096 patent at 7:50-59.  In short, the patents describe a system of monitoring for *any* information about *any* human characteristic in order to figure out what an audience might like and giving them what they want—an ancient and very human concept most commonly known as reading the room.

---

[1] Because the specification is common, for simplicity, specification citations use the '096 patent.

### 1.      Different People May Like Different Things at Different Times

The specification confirms the sweeping breadth of the relevant field of "effective communication":

> Human communication is the transmission of information by oral, written, electronic or other modalities, from one person to another that is received and understood.  Information may include, but is not limited to, data, statistics, images, color, indicia, thoughts, and feelings.  To be effective communication, the information must be accurate, clear, concise, coherent, and, most importantly, appropriate to the person receiving the information.

'096 patent at 1:25-32; *id.* at 1:38-40 ("the communicator may be able to predict the effectiveness of his or her communication once characteristics of the information recipient are known").  The specification notes that numerous prior art solutions existed "to effectively communicate information to one or more information recipients."  *Id.* at 1:25.  The specification acknowledges that these methods of communication were well known and even instinctual, including "body language" and "physically handing out materials."  *Id.* at 5:64-66; *see also id.* at 2:29 (information for communication can include "thoughts" and "feelings").

### 2.      The Patents Suggest Reading the Room to Give People What They Want

The specification states that "biological response information is necessary to assess whether it makes sense to make further adjustments to the content of the information being communicated to information recipients such that the effectiveness of the communication is maximized."  '096 patent at 6:39-42.  This can be achieved, according to the patent, by using "direct information about an individual's biological reaction to information" rather than "remote sensing and inferential determinations."  *Id.* at 6:44-47.  These "biological reactions" include facial expressions and laughter in addition to changes in body temperature or heart rate.  *Id.* & *id.* at 7:5-6.  "Direct measurements of physiological effects on information recipients are well known in the art," and prior art systems disclosed gathering reaction information, such as "whether an individual is facing the communications display, changing body poses to face the

display, changing body expressions (visual, tracking of body features), changing facial

expression as the message is displayed (visual), suddenly becoming silent (audio level down), or

starting to laugh/concentrate because of the content (audio change)" as well as "using body

language detectors for indirectly assessing a psychological state of individuals in order to tailor

the content of information." *Id*. at 6:63-65.  The specification nevertheless concludes there was:

> a need for a system and method for actively, dynamically, and seamlessly updating and
> tailoring information that is being or will be communicated to information recipients who
> are directly or at least proximate a communications modality using predictive-type
> characteristics about the recipients such as geographic, demographic, psychographic, and
> behavioristic characteristics, and inferred, derived, and direct physiological characteristics,
> which are continuously or nearly continuously being monitored and evaluated.

*Id*. at 7:50-59.  The invention claims to be "suited to communicating information to captive

audiences, such as those waiting in a movie theater."  *Id.* at 8:9-11.

The patent describes using any "hardware, software, firmware, special purpose

computing devices, or a combination thereof" to monitor one or more "information recipients" to

assess any number of "characteristics," which range from observed data like "manual

observations," "face recognition," "facial features (e.g., smiling),"or "height" to third-party data

such as "level of education" and "habits," and personal preferences, like a recipient's "preference

for whether a man or woman delivers the communication."  *Id*. at 10:18-19, 16:5-46, 17:10-11.

**B.    The Patents Do Not Claim Any Specific Mechanism, But Instead Sweep in Any
        Attempt to Read the Room Using Any Technology**

**1.    The Asserted Claims Are Representative**

Comsys asserts claim 5 of the '096 patent and claim 11 of the '535 patent; these claims

are representative for the purpose of the *Alice* inquiry, as they are drawn to the same abstract idea

and each recite elements performed by conventional computing components.  "The Federal

Circuit has held that the district court is not required to individually address claims not asserted

or identified by the non-moving party, so long as the court identifies a representative claim and

'all the claims are substantially similar and linked to the same abstract idea.'" *Novo Transforma Techs., LLC v. Sprint Spectrum L.P.*, No. 14-612, 2015 WL 5156526, at *2 (D. Del. Sept. 2, 2015), *aff'd*, 669 F. App'x 555 (Fed. Cir. 2016) (quoting *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n,* 776 F.3d 1343, 1348 (Fed. Cir. 2014)); see *Alice*, 573 U.S. at 225-227 (finding a single claim "representative" of all claims across four patents); *see also*, *e.g., TrackTime, LLC v. Amazon.com, Inc.,* No. 18-1518, 2019 WL 2524779, at *3 (D. Del. June 19, 2019).

The asserted claims easily meet this test, as the other claims of the patents "are substantially similar and linked to the same abstract idea." *Novo Transforma*, 2015 WL 5156526, at *2. Comsys' complaint further confirms the asserted claims are representative, as it treats the various claim elements as interchangeable across the patent claims. *See*, *e.g*., Compl. ¶¶ 73, 85.

### 2. Claim 5 of the '096 Patent

Comsys asserts claim 5 of the '096, "A computer-implemented system comprising":

a portable device for providing information for use in identifying a presence of an information recipient at a pre-determined location, space, or area during a pre-determined time period;

a biometric sensor in, on or near the information recipient useful in identifying a physiological state or identifying a change in the physiological state of the information recipient;

a database for storing information of or about the information recipient, the stored information comprising the identified physiological state or the identified change in the physiological state information, and at least one non-physiological state information; and

an information content generator for generating at least one information element for communication to the information recipient at a time during the pre-determined time period, wherein the information element is selected based on the at least one non-physiological state information and the identified physiological state or the identified physiological change information.

'096 patent, claim 5.  This claim does not limit itself to any specific way of accomplishing this goal; to the contrary, it seeks to include any mechanism used to read the room.  And the specification repeatedly confirms that each claim element may employ any number of known technologies.  *E.g.*, *id.* at 12:38-41 ("[v]arious biometric sensing devices may be used to identify characteristics"); 17:36-37 ("[t]he personal information and preferences may be stored electronically in, for example, a database or spreadsheet, or in a collection of individual files indexed in a database"); 17:1-4 ("[t]he database 612 may be a relational database, and may include a database management system, as well as a graphical user interface for administrative and customer access to the information being collected and stored in the database"); 24:54-57 ("[t]he information agent 610 may operate on a single networked computer 402, or on a plurality of distributed networked computers co-located at the same or different facilities"); and 20:11-14 ("information content generator may be executed on the computing device 402, or it may be executed on a communications device, such as television 304, or both").  The final step of claim 5 requires the system to "generat[e] at least one information element for communication to the information recipient" "based on" the analyzed characteristics, but, again, does not identify any specific steps or configurations of components used to analyze or generate content "based on" any characteristics.  Instead, the specification again explains that any broadcast is sufficient.  *Id.* at 11:46-49 ("the output contains broadcast signal content from a broadcast, satellite, or cable providers, which are synonymous with the information content generator.").

### 3.  Claim 11 of the '535 Patent

Plaintiff asserts claim 11 of the '535, "A computer-implemented system comprising":

a sensor for measuring a physiological state of, or obtaining information useful in determining an identity of, one or more information recipients in or at a location, space, or area and at or during a pre-determined time or time period;

a plurality of information elements each comprising one or more content, the plurality of information elements adapted to being stored in a database or on a computing device;

– 6 –

a broadcast device for outputting any one of or all of the one or more content of the one or more of the plurality of information elements; and

a software code adapted to running on the computing device for receiving the information useful in determining the identity of the one or more information recipients, the measured physiological state, an information about the physiological state, and at least one non-physiological state characteristic information of the one or more information recipients, and for selecting the one or more of the plurality of information elements for outputting to the one or more information recipients.

'535 claim 11. Here, again, the claim does not limit itself to any specific mechanism, but includes only generic hardware elements such as a "sensor" and "software code." Again, the specification only confirms the generic nature of those components. For example, the claimed "sensor for measuring physiological state" may include, "but are not limited to those that assess, measure, predict, directly or indirectly, or otherwise determine a person's weight, physical motion or movement, temperature (e.g., surface skin or internal), sound level (i.e., talking), odors, cardiac information (e.g., physioelectrical signals), brain activity, blood chemical content, pupil dilation, head position, and biometric load, and bending and torsional stresses on joints, and changes thereto over time" (*id.* at 35:2-9), or any other kind of sensors "associated with a portable computing device, such as a hand-held mobile telephony device or a restaurant waiting area alert device, that senses pulse, oxygen content, audio, movement, location, electrical charges, and skin (hand) temperature." *Id.* at 31:32-36. And the selected information can include anything at all. *E.g.*, *id.* at 24:37-40 ("information of interest about to [sic] the location of the information recipients, such as local weather, news and sports"). The "broadcast device" is similarly generic. *Id.* at 23:39-40 ("a television monitor 304 that is presenting a broadcast"); 26:28-31 ("a radio that tunes radio frequency broadcast signals; a mobile telephony device, including those that receive and assemble data packets; a mobile computing device that receives and processes different types of signals."). Finally, the "software code useful in determining" characteristics and "selecting" information to output "may be implemented in various forms. For

– 7 –

example, the invention may be embodied in hardware, software, firmware, special purpose

computing devices, or a combination thereof." *Id.* at 10:34-42.

## LEGAL STANDARD

A motion under Federal Rule of Civil Procedure 12(c) may be made "after the pleadings

are closed but within such time as not to delay the trial." Fed. R. Civ. P. 12(c). Courts "apply the

same standards as under Rule 12(b)(6)" to motions under Rule 12(c), rendering any distinction

purely procedural. *See, e.g.*, *Turbe v. Gov't of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir.

1991). This Court is familiar with those standards, including that facts alleged in the Complaint

are taken as true, but legal conclusions are not. *See Kaavo Inc. v. Cognizant Tech. Sols. Corp*.,

No. 14-1192, 2016 WL 1268308, at *2 (D. Del. Mar. 31, 2016).

Patentability under 35 U.S.C. Section 101 is a "threshold legal issue" that is "properly

raised at the pleading stage if it is apparent from the face of the patent that the asserted claims are

not directed to eligible subject matter." *ClearDoc*, *Inc. v. RiversideFM, Inc*., No. 21-1422, 2022

WL 606698, at *2 (D. Del. Feb. 22, 2022) (citing *Bilski v. Kappos*, 561 U.S. 593, 602 (2010) &

*Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017)).

"The two-stage inquiry for patent eligibility" is "set forth by the Supreme Court in *Mayo*

*Collaborative Services v. Prometheus Laboratories, Inc.*, [566 U.S. 66] (2012), and *Alice Corp.*

*Pty. v. CLS Bank Int'l*, [573 U.S. 208] (2014)." *Affinity Labs of Texas, LLC v. Amazon.com Inc.,*

838 F.3d 1266, 1268 (Fed. Cir. 2016).

## ARGUMENT

The claims of the '096 and '535 patents are invalid under 35 U.S.C. § 101 because they

claim only the abstract concept of reading the room, and thus fail both prongs of the test

articulated by the Supreme Court in *Alice Corp. Pty. v. CLS Bank Int'l*., 573 U.S. 208 (2014).

– 8 –

## I.   *Alice* Step One:  The Claims Are Directed to the Patent-Ineligible Concept of Reading the Room

The '096 and '535 patents easily fail *Alice* step one:  they claim only the patent-ineligible concept of reading the room.  When "determin[ing] whether the claims at issue are directed to a patent-ineligible concept," *Alice,* 573 U.S. at 218, courts will consider whether patents claim "a specific means or method that improves the relevant technology," or are "directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016); *see also Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F. 3d 1303, 1306 (Fed. Cir. 2020) (considering "whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies an abstract idea for which computers are invoked merely as a tool."); *Ficep Corp. v. Peddinghaus Corp.*, No. 19-1994, 2022 WL 608189, at *5 (D. Del. Feb. 28, 2022) (claims ineligible where they "fail[] to provide any technical details for the tangible components" or "recite how these components perform [the claimed functions]").  So too here.

### A.   Reading the Room, an Ancient Human Activity, is an Abstract Idea

"The Supreme Court has held that 'fundamental . . . practice[s] long prevalent in our system of commerce' are abstract ideas.  Similarly, [courts] view well-established 'methods of organizing human activity' as abstract."  *BSG Tech. LLC v. Buyseasons, Inc.*, 899 F. 3d 1281 (Fed. Cir. 2018) (alterations in original) (citing *Alice,* 573 U.S. at 220 & *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016)).  Reading the room—observing one's audience and responding to it—is as old as humanity itself.  Hamlet does it in *Hamlet*, combining his suspicion that Claudius killed his father—what the patents call "non-physiological state information," *supra*—with observations of Claudius' reaction to the play-within-a-play ("mine eyes will rivet to his face," William Shakespeare, Hamlet act 3, sc. 2, I. 90) in order to "catch the

– 9 –

conscience of the king." *Id.* act 2, sc. 2, I. 634.  When Claudius reacts poorly, *id*. act 3, sc. 2, l. 291-297, Hamlet changes his communication in response, calling him "a murderer and a villain." *Id.* act 3, sc. 4, l. 110.  Hercule Poirot reads the room over and over again, most famously in *Death on the Nile*, directing his suspicion toward the murderers after one "overdid the devoted manner" of a husband and the other "pretended that somebody had overheard" a conversation. Agatha Christie, Death On the Nile 304 (Greenway ed. 1965).  And Dale Carnegie's *How to Win Friends and Influence People* is a book-long exhortation to read the room, containing story after story of people who observe reactions and adjust their communications in response, making sure that others "felt better because I had handled the situation with consideration for their point of view."  Dale Carnegie, How to Win Friends and Influence People 195 (11th ed. 1943).  Reading the room is "an abstract idea known outside of a computer or Internet context and could be practiced using only the human mind."  *Collarity, Inc. v. Google Inc.*, No. 11-1103, 2015 WL 7597413, at *8 (D. Del. Nov. 25, 2015).  "[C]omputational methods which can be performed entirely in the human mind are the types of methods that embody the 'basic tools of scientific and technological work' that are free to all men and reserved exclusively to none."  *CyberSource Corp. v. Retail Decisions, Inc.,* 654 F. 3d 1366, 1372 (Fed. Cir. 2011).  The "application of only human intelligence to the solution of practical problems is no more than a claim to a fundamental principle."  *Id.* at 1371-72.

The specification admits that the patented technology relates to "human communication," which is (and always has been) ideally "appropriate to the person receiving the information." '096 patent at 1:25-32.  This District has held subject matter abstract where, as here, "the improvements described in the specification appear to originate exclusively with the removal of human operators."  *Ficep Corp.*, 2022 WL 608189, at *5.  The patent posits no difference between a computer or a human operator analyzing a person's "psychological state" by looking

at them to see "whether an individual is facing the communications display," or to recognize

"changing facial expression as the message is displayed (visual)," or to see that they are "starting

to laugh/concentrate because of the content (audio change)." '096 patent at 6:56-62.  The patents

supply no particular configurations or technical details about how the claimed system would

carry out the invention, *see supra* § B.1, and thus claim nothing more than a "'black box'

processor that replaces the human operator in an unspecified manner.'" *Ficep Corp*., 2022 WL

608189, at *6 (quoting *Dropbox, Inc. v. Synchronoss Techs., Inc*., 815 F. Appx 529, 533 (Fed.

Cir. 2020)); *see also Realtime Data LLC v. Array Networks Inc*., 556 F. Supp. 3d 424, 432 (D.

Del. 2021) ("In order to be patentable, claims must do more than simply process data").  "The

improvements described in the specification appear to originate exclusively with the removal of

human operators, achieved via the abstract idea." *Ficep*, No. 19-1994, 2022 WL 608189, at *5;

*id.* (finding subject matter that "seeks to simply automate the prior art methods to minimize

human error and fails to recite any specific technological improvement to manufacturing or

computer technology" abstract); *cf. Broadsoft, Inc., v. CallWave Commc'ns, LLC*, 282 F. Supp.

3d 771, 781 (D. Del. 2017) (finding claims directed to an abstract idea where the "'problem'

addressed was a human unavailability problem" and not "a problem specific to telephony

technology").

## B.    Precedent Confirms the Asserted Patents Are Ineligible Under *Alice*

Because "filtering content" based on user characteristics is "a longstanding, well-known

method of organizing human behavior," the Federal Circuit has repeatedly held that patents on

"targeting" or "customizing" or "filtering" information for users are ineligible as directed to

abstract ideas.  *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348

(Fed. Cir. 2016).  Courts in this district have similarly held patents claiming "collecting and

managing data such as video and audio recording," and "collecting, analyzing, manipulating, and displaying data" each fail *Alice* step one.  *See ClearDoc, Inc.*, 2022 WL 606698, at \*4.

In *Intellectual Ventures I LLC v. Capital One Bank*, the Federal Circuit held that tailoring communications is an abstract concept, as is the "long prevalent" concept of "customizing information based on (1) information known about the user and (2) navigation data":

> This sort of information tailoring is "a fundamental . . . practice long prevalent in our system . . . ."  *Id*.  There is no dispute that newspaper inserts had often been tailored based on information known about the customer—for example, a newspaper might advertise based on the customer's location. Providing this minimal tailoring—e.g., providing different newspaper inserts based upon the location of the individual—is an abstract idea.
>
> . . . .
>
> Although the claim includes a "dynamic" limitation, the specification makes clear that determining whether the user falls into one category or another (e.g., whether the viewer is a "Generation X'er" or an "older individual") and then presenting the user a pre-created advertisement based on the category determination, satisfies the dynamic requirement. . . .[t]he web site might have a series of pre-designed advertisements, which, based on the user's information, the web site would then choose between and present to the user.  Moreover, the fact that the web site returns the pre-designed ad more quickly than a newspaper could send the user a location-specific advertisement insert does not confer patent eligibility.

792 F.3d 1363, 1369-70 (Fed. Cir. 2015); *see also Internet Patents Corp. v. Active Network, Inc*., 790 F.3d 1343, 1346 (Fed. Cir. 2015).

Similarly, in *Affinity Labs of Texas, LLC v. Amazon.com Inc*., 838 F.3d 1266 (Fed. Cir. 2016), the Federal Circuit found ineligible under § 101 a patent claiming a "method for targeted advertising" in which "an advertisement is selected for delivery to the user of a portable device based on at least one piece of demographic information about the user."  *Id*. at 1267.  *Affinity* held that "the concept of delivering user-selected media content to portable devices is an abstract idea," and that the claims utilized only generic capabilities of computers that the patentee did not invent at a level generality known in the art as of the priority date of the patent.  *Affinity*, 838 F.3d at 1269.  As in *Affinity*, the patents here "do no more than describe a desired function or

– 12 –

outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem," *id.*, and fail to identify "any specific technology or instructions that explain how the device can do what it purports to do or direct the practitioner how to carry out the claims." *Id.* at 1268. "Whether labeled as a fundamental, long-prevalent practice or a well-established method of organizing activity, this qualifies as an abstract idea." *BSG Tech.,* 899 F. 3d at 1286. The asserted claims are therefore abstract under *Alice* step one.

## II.  *Alice* Step Two:  The Asserted Claims Contain No Inventive Step

Because the patents claim only the abstract idea of reading the room, the Court should "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice,* 573 U.S. at 221. Claims "fail *Alice* step two when they are directed to 'an abstract idea implemented on generic computer components, without providing a specific technical solution beyond simply using generic computer concepts in a conventional way." *ClearDoc, Inc. v. RiversideFM, Inc.,* No. 21-1422, 2022 WL 606698, at *6 (D. Del. Feb. 22, 2022) (quoting *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC,* 827 F.3d 1341, 1352 (Fed. Cir. 2016)).

> Neither "[a] simple instruction to apply an abstract idea on a computer," nor "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer" satisfies the requirement of an "inventive concept." "To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not."

*Ficep,* 2022 WL 608189, at *7 (alterations in original) (citations omitted). "[G]eneric computer functions, such as storing, analyzing, organizing, and communicating information, carry no weight in the eligibility analysis." *In re Marco Guldenaar Holding BV,* 911 F. 3d 1157, 1165 (Fed. Cir. 2018).

### A.    '096 Patent Claim 5 Identifies Only Generic Components and No Inventive Step, Failing Step Two

Claim 5 of the '096 patent concerns a "computer-implemented system" comprising a series of generic devices performing their generic functions.  First, "a portable device"—of any kind, *see* '096 patent at 12:37-39—is used "for providing information." *Id.* at 33:43.  Neither the claim nor the specification provides any description of how to provide this information or any technical details towards doing so.  Instead, the specification recites only generic components such as "portable computing and telephony devices, etc." (*id.* at 27:11) and "a hand-held mobile telephony device or a restaurant waiting area alert device." *Id.* at 31:33-35.  The portable device of the claim is therefore no more than a "ubiquitous information-transmitting medium," which is "not a novel machine." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716-17 (Fed. Cir. 2014). Next, a "biometric sensor"—of any kind, *see* '096 patent at 35:2-9—can be "useful in identifying a physiological state or identifying a change in the physiological state." *Id.* at 33:48-49.  Again, the patent provides no description of how a sensor should be "identifying a physiological state or identifying a change in the physiological state," instead confirming that any combination of known components may be used in any known way. *Id.* at claim 5.  So, too, the "database for storing information of or about the information recipient" lacks any limitations or instructions. *Id.* at 33:51-52.

Finally, claim 5 requires an "information content generator for generating at least one information element."  The "information content generator" is, according to the specification, "synonymous with" generic communications such as "a broadcast, satellite, or cable providers," about which the provides no further limits or detail. *Id.* at 11:49-50.  "The information content generator 104 may be executed on the computing device 402, or it may be executed on a communications device, such as television 304, or both." *Id.* at 23:37-39.  Likewise, the

"information element" of claim 5 includes any sort of information such as ads ('096 patent at

26:27), entertainment (*id*. at 28:52-59), television or other types of broadcasts (*id*. at 23:65-66).

The patent nowhere describes how to generate any "information elements."  Claim 5 calls for the

"information content generator" to select an information element "based on the at least one

non-physiological state information and the identified physiological state or the identified

physiological change information."  But neither the claims, nor the specification, provide any

technical details, restrictions, or specific means of making such a selection.  Instead, they

repeatedly describe the selection process as some unspecified analysis:

- "In step 1110, the information agent 510 and information content generator 104 input and **analyze the characteristics information** obtained in steps 1106 and 1108 in order to, in step 1112, **assess the optimal information elements** and final content that should be provided, delivered, outputted, etc., to the communications devices as the communication 102 which is sensible by the information recipients" (*id.* at 25:43-49);

- "Thus, the advertisements shown on the theater screen (output signal 808) are targeted to those information recipients in a dynamic fashion by **selecting**, from a plurality of available information elements, the **information elements that will have the highest probability of effectively communicating the message that the advertiser wishes to communicate** to that group of information recipients" (*id.* at 26:62 to 27:2);

- **"That information could be used to select segments** for the safety message that older passengers might be more responsive to, or at least more interested in" (*id.* at 29:43-46);

- "The information elements **may be selected** from the set of information elements 804 as well as local information elements (which may contain information of interest about to the location of the information recipients, such as local weather, news and sports)" (*id.* at 23:63-67).

The patent thus treats the information content generator as a replacement for selections made by

a human operator, and "[s]imply replacing the human operator with a conventional machine is

not an inventive concept and is not sufficient to transform the claims into patent-eligible subject

matter."  *Ficep Corp.,* 2022 WL 608189, at *6 (quoting *Content Extraction*, 776 F.3d at 1348).

When "[t]he specification simply states that a user interface can be customized 'in a plurality of

ways,'" as it does here, that "do[es] not constitute a concrete application of the abstract idea of

delivering content to a wireless device and thus do not embody an 'inventive concept,' as that term has been used in the *Mayo/Alice* line of cases." *Affinity,* 838 F.3d at 1272.  Claim 5 thus "recite[s] the concept, but not the way to implement it," and is ineligible for patenting.  *Epic IP LLC v. Backblaze, Inc.,* 351 F. Supp. 3d 733, 740 (D. Del. 2018).

In its complaint, Comsys argues that "claim 5 of the '096 Patent provides meaningful details on how to implement its system, and thus adds something inventive."  Compl. ¶ 27. Comsys argues:

> 'How' the system operates in an inventive way is due to different content to replace some of a first information element content based on at least the one nonphysiological state information associated with the at least one information recipient or the other information recipients and one or more of the classified at least one response, the identified physiological state, the identified change in the physiological state, and the monitored facial feature of the at least one information recipient.

Compl. ¶ 29.  Comsys' attempt to explain the inventive step merely confirms that none exists. Like the claims, the complaint acknowledges that the "first information element" can be *anything*, and that *any* change causing *any* output is somehow a defined inventive step. Although couched in technical jargon, Comsys' alleged "how" lacks any specific solution, and would include noticing that an audience of teenagers is not laughing at G-rated material and moving on to more risqué jokes—in other words, reading the room.

### B.    '535 Patent Claim 11 Identifies Only Generic Components and No Inventive Step, Failing Step Two

Asserted claim 11 of the '535 patent describes a "computer-implemented system" with several components described in functional terms.  It claims "a sensor" for "obtaining information useful in determining an identity of, one or more information recipients."  '096 patent at 15:34-35.  The claimed sensor can be *any* sensor "associated with a portable computing device, such as a hand-held mobile telephony device or a restaurant waiting area alert device, that senses pulse, oxygen content, audio, movement, location, electrical charges, and skin (hand)

– 16 –

temperature." '096 patent at 31:31-37.  The patent claims no particular technique for how or

what information the sensor should provide.  *See, e.g.*, *id.* at 17:49-59, 27:41-46.  As the

specification acknowledges, the "pre-determined space" of the claim "can be a public space,"

"the pre-determined time period is all or a portion of 24 hours."  *Id.* at 8:55-60.  The claim

requires "a plurality of information elements" that can be "stored in a database" and that "each

compris[e] one or more content."  '535 patent, claim 11.  Again, the specification sweeps any

"Advertisement,"  or "information of interest about to [sic] the location of the information

recipients, such as local weather, news and sports" into its definition of "information elements,"

'096 patent at 24:38-40, and adds nothing beyond the generic requirement that the information

be storable in a database—which is necessarily true of *all* information, and which the patentee

does not (and cannot) claim to have invented.  *Id.* at 15:52-67.  The next element, a "broadcast

device," is any device that can output a broadcast, such as "a radio that tunes radio frequency

broadcast signals; a mobile telephony device, including those that receive and assemble data

packets; a mobile computing device that receives and processes different types of signals."  *Id*. at

26:28-31.  The claim requires only that the "broadcast device" be "for outputting any one of or

all of the one or more content," which does nothing to narrow the concept of a "broadcast

device," and thus provides no limiting specifics.  '535 patent, claim 11.

The final element claims "a software code adapted to running on the computing device"

of the system, "for receiving the information" about information recipients and "selecting the one

or more of the plurality of information elements for outputting to" the information recipients.

'535 patent, claim 11.  The specification spills little ink on this "software," mentioning only that

in some preferred embodiments, the software might be "a face-recognition Software Subsystem

that evaluates characteristics of each individual at the location," *id.* at 13:17-18, and otherwise

explaining that "because some of the constituent system components and method steps depicted

in the accompanying figures are preferably implemented in software, the actual connections between the system components (or the process steps) may differ depending upon the manner in which the present invention is programmed." *Id.* at 10:56-61. Again, the patent provides no detail about the software's "selection" of information elements for output beyond the circular and repeated explanation that "a discrete element of information 802 is selected, by the information agent 610, from among a plurality of discrete information elements 804 based on the characteristics of one or more information recipients." *Id*. at 23:51-54; *see, e.g., id.* at 23:63-67. These claim elements "simply describe the 'effect or result produced' not 'how to implement' the desired result." *X One, Inc. v. Uber Techs., Inc.*, 239 F. Supp. 3d 1174, 1193 (N.D. Cal. 2017). They describe only in the abstract that information will be received and selected for output "rather than describe how those processes will function or focus on any particular tool that achieves the desired result." *Id.* Using existing technologies to tailor communications is neither a technological improvement nor an inventive application of conventional technology. The asserted claims accordingly fail *Alice* step two.

As with the prior claim, Plaintiff argues in its complaint that "claim 11 of the '535 Patent provides meaningful details on how to implement its system, and thus adds something inventive." Compl. ¶ 45. But here, the plaintiff does not even attempt to identify a "how," instead reciting the generic language of the claims. Compl. ¶ 47 ("'How' the system operates in an inventive way is due to [a complete list of the claim limitations]"). Comsys does not—and cannot—identify any specific technical solution in claim 11.

## III.   Comsys Cannot Plead Around The Requirements of Section 101

Plaintiff, surely worried about patent eligibility, attempts to address this motion in its complaint, devoting several paragraphs to boilerplate assertions of eligibility. *See, e.g.*, Compl. ¶¶ 24, 42 ("[each asserted claim] is a practical application and inventive step of technology that

address these aforementioned specific computer-centric problems"); *id.* ¶¶ 27, 33, 34, 45, 51, 52. But Comsys cannot "circumvent the § 101 inquiry on an early motion to dismiss or motion for judgment on the pleadings simply by including a few lines attesting to the novelty of the invention." *Appistry, Inc. v. Amazon.com, Inc.*, 195 F. Supp. 3d 1176, 1183, n.6 (W.D. Wash., 2016) *aff'd sub nom. Appistry, LLC v. Amazon.com, Inc.*, 676 F. App'x 1008 (Fed. Cir. 2017). Courts in this District routinely dismiss claims for lack of patentable subject matter at the pleading stage. *See, e.g., Fast 101 PTY Ltd. v. Citigroup Inc.*, 424 F. Supp. 3d 385, 389 (D. Del. 2020), *aff'd*, 834 F. App'x 591 (Fed. Cir. 2020); *IPA Techs., Inc. v. Amazon.com, Inc.*, 352 F. Supp. 3d 335, 343 (D. Del. 2019); *Inventor Holdings, LLC v. Gameloft, Inc.*, 135 F. Supp. 3d 239, 245 (D. Del. 2015); *Zyrcuits IP LLC v. Acuity Brands, Inc.*, No. 20-1306, 2021 WL 3287801, at *6 (D. Del. Aug. 2, 2021); *TrackTime, LLC v. Amazon.com, Inc.*, No. 18-1518, 2019 WL 2524779, at *1 (D. Del. June 19, 2019); *Sandbox Software*, 2019 WL 2524780, at *1; *TriPlay, Inc. v. WhatsApp Inc.*, No. 13-1703, 2018 WL 1479027, at *6 (D. Del. Mar. 27, 2018). This Court should do so here.

## CONCLUSION

Because the '096 and '535 patent claims are ineligible for patenting under 35 U.S.C. § 101, Comsys' factual allegations, taken as true, do not avoid dismissal. *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC,* 874 F.3d 1329, 1341 (Fed. Cir. 2017). Uniphore respectfully requests that the Court enter judgment on the pleadings on all counts of the complaint.

Date:  August 1, 2022

/s/ Andrew E. Russell
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
*Attorneys for Defendant Uniphore
Technologies Inc.*

OF COUNSEL:
Matthew S. Warren
Erika Warren
Francesca M.S. Germinario
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, CA 94114
(415) 895-2940

Dated: August 1, 2022

– 20 –